# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

OMAR CATARINO GONZALEZ,

       Defendant-Appellant.

UNPUBLISHED
January 31, 2017

No. 327859
Kent Circuit Court
LC No. 13-010880-FH

---

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

OMAR CATARINO GONZALEZ,

       Defendant-Appellant.

No. 327860
Kent Circuit Court
LC No. 14-008575-FH

---

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

ROBERTO DAVID GONZALEZ,

       Defendant-Appellant.

No. 327861
Kent Circuit Court
LC No. 14-009081-FH

---

Before: SHAPIRO, P.J., and HOEKSTRA and SERVITTO, JJ.

PER CURIAM.

In Docket No. 327859, defendant Omar Catarino Gonzalez appeals as of right his bench trial convictions of possession with intent to deliver less than five kilograms or 20 plants of marijuana, MCL 333.7401(2)(d)(*iii*), and maintaining a drug house, MCL 333.7405(d). These

-1-

convictions arose from the search of a medical marijuana dispensary, "Hydroworld," on October 30, 2013. In Docket No. 327860, Omar appeals as of right his bench trial convictions of a separate count of possession with intent to deliver less than five kilograms or 20 plants of marijuana, MCL 333.7401(2)(d)(*iii*), and a separate count of maintaining a drug house, MCL 333.7405(d). These convictions arose out of a search of Hydroworld on August 7, 2014. In Docket No. 327861, defendant Roberto David Gonzalez appeals as of right his bench trial convictions of possession with intent to deliver less than five kilograms or 20 plants of marijuana, MCL 333.7401(2)(d)(*iii*), and maintaining a drug house, MCL 333.7405(d). These convictions arose out of the search of a home at 1809 Aberdeen on August 7, 2014. Both defendants were sentenced to a total of 18 months' probation. We affirm.

On appeal, both defendants argue that the trial court erred in denying their motions to suppress the evidence obtained in the searches on the ground that the affidavits supporting the search warrants were deficient. We disagree.

> We review de novo a trial court's ultimate decision on a motion to suppress on the basis of an alleged constitutional violation. The trial court's findings of fact from a suppression hearing are reviewed for clear error, according deference to the trial court's determination. A finding of fact is clearly erroneous if, after a review of the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made. Any ancillary questions of law relevant to the motion to suppress are also reviewed de novo. [*People v Gingrich*, 307 Mich App 656, 661; 862 NW2d 432 (2014) (quotation marks and citations omitted).]

"However, after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review. A magistrate's determination of probable cause should be paid great deference by reviewing courts." *People v Keller*, 479 Mich 467, 474; 739 NW2d 505 (2007) (quotation marks and citations omitted).

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and *no Warrant shall issue, but upon probable cause*, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. [US Const, AM IV (emphasis added).]

"A search warrant may only be issued upon a showing of probable cause. Probable cause to issue a search warrant exists if there is a substantial basis for inferring a fair probability that evidence of a crime exists in the stated place." *People v Brown*, 297 Mich App 670, 675; 825 NW2d 91 (2012) (citations omitted).

> In reviewing a magistrate's decision to issue a search warrant, this Court must evaluate the search warrant and underlying affidavit in a common-sense and realistic manner. This Court must then determine whether a reasonably cautious person could have

concluded, under the totality of the circumstances, that there was a substantial basis for the magistrate's finding of probable cause. [*People v Poole*, 218 Mich App 702, 705; 555 NW2d 485 (1996).]

"To find a substantial basis, we must ensure that there is a fair probability that contraband or evidence of a crime will be found in particular place." *People v Mullen*, 282 Mich App 14, 22; 762 NW2d 170 (2008) (quotation marks and citation omitted).

In determining whether information in an affidavit supporting a search warrant is stale, "the test is not whether the items could be moved or changed but whether there was a 'fair probability' that the items were in the place to be searched." *People v Sobczak-Obetts*, 253 Mich App 97, 110; 654 NW2d 337 (2002). "The threshold inquiry looks at the life cycle of the evidence sought, given a totality of circumstances, that includes the criminal, the thing seized, the place to be searched and, most significantly, the character of the criminal activities under investigation." *People v Russo*, 439 Mich 584, 605; 487 NW2d 698 (1992). The Supreme Court has stated:

> Time as a factor in the determination of probable cause to search is to be weighed and balanced in light of other variables in the equation, such as whether the crime is a single instance or an ongoing pattern of protracted violations, whether the inherent nature of a scheme suggests that it is probably continuing, and the nature of the property sought, that is, whether it is likely to be promptly disposed of or retained by the person committing the offense. [*Id*. at 605-606.]

With regard to defendants' claims concerning the alleged misstatements in the affidavits supporting the search warrants, "[t]he defendant has the burden of showing, by a preponderance of the evidence, that the affiant knowingly and intentionally, or with a reckless disregard for the truth, inserted false material into the affidavit and that the false material was necessary to the finding of probable cause." *People v Waclawski*, 286 Mich App 634, 701; 780 NW2d 321 (2009). As the United States Supreme Court has stated:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. [*Franks v Delaware*, 438 US 154, 171; 98 S Ct 2674; 57 L Ed 2d 667 (1978).]

The trial court did not err in denying Omar's motion to suppress the evidence seized during the October 30, 2013 search of Hydroworld on the ground that the allegations in the supporting affidavit were stale.

Omar's sole argument on this point is that the two traffic stops cited in the affidavit supporting the search warrant were not dated and, therefore, the information supporting a finding of probable cause was stale. The affidavit, signed by Kent County Detective Daniel Alderink, provided in relevant part:

> Your affiant was contacted by Deputy Ritchie and Deputy Hinds on October 30, 2013, who stated that Hydroworld was still open for business. Two traffic stops were conducted on people leaving Hydroworld and both subjects were in possession of marijuana which was purchased from the business.

> The first subject is Edward Lee Mason, DOB: 04/09/1991. Mr. Mason was in possession of approximately three (3) grams of marijuana that he said he had purchased from a person named "Omar" at Hydroworld. Mr. Mason has an expired Michigan medical marijuana Patient car[d]. This card expired on 08/01/2013 and lists his caregiver as Wafa M. Amash. The card registry No. is P300815-130801.

> The second subject is Colton James Westerling, DOB: 03/04/1993. Mr. Westerling was in possession of a half ounce of marijuana that he said was purchased from Hydroworld. Mr. Westerling had a valid Michigan medical marijuana card and also stated that he purchased the marijuana from "Omar."

Contrary to Omar's assertion on appeal, Detective Alderink did not admit that the dates of the traffic stops were omitted from the affidavit. Rather, he stated that the first sentence, i.e., the sentence containing the date "October 30, 2013," applied to the entire paragraph. We defer to the magistrate's conclusion that these stops were conducted on October 30, 2013, the date the warrant was obtained and executed. *Keller*, 479 Mich at 474. Moreover, even if the traffic stops were "undated," law enforcement was investigating what they believed to be an illegal medical marijuana dispensary. That is, they were not investigating a single criminal instance, but rather an "ongoing pattern of protracted violations[.]" *Russo*, 439 Mich at 605-606. This ongoing pattern was supported by two traffic stops of medical marijuana patients in possession of marijuana leaving Hydroworld. Likewise, the "inherent nature of a scheme [i.e., operating a medical marijuana dispensary] suggests that it is probably continuing[.]" *Id*. Given that the affidavit supported that medical marijuana patients were being sold marijuana from Hydroworld, "there was a fair probability that the items [i.e., marijuana] were in the place to be searched." *Sobczak-Obetts*, 253 Mich App at 110. Omar argues that the affidavit provided no basis to infer that more marijuana might be discovered upon searching Hydroworld. However, given that two traffic stops of vehicles leaving Hydroworld revealed marijuana, there was a fair probability that more marijuana was located therein. Moreover, the search warrant also sought business records and other documentation evidencing the sale or manufacture of marijuana. Thus, even if there was an insufficient basis to believe that more marijuana was located on the premises, law enforcement validly sought documentation or other evidence of the two purchases believed to have been made at Hydroworld. In sum, the totality of the circumstances, particularly the

"character of the criminal activities under investigation[,]" i.e., selling medical marijuana from a dispensary, supported that the traffic stops, even if they were undated, were not so stale as to prohibit the magistrate's finding of probable cause. *Keller*, 479 Mich at 474; *Russo*, 439 Mich at 605.

The trial court also did not err in denying Omar's motion to suppress the evidence seized during the August 7, 2014, search of Hydroworld on the grounds that the search warrant was stale.

The affidavit supporting the search warrant for Hydroworld, issued July 30, 2014, and executed August 7, 2014, contained the following allegations: a "credible reliable confidential informant" purchased marijuana concentrate at Hydroworld from Omar on July 21, 2014; the same informant purchased marijuana concentrate from Roberto on July 22, 2014; the same informant purchased marijuana concentrate from Roberto on July 29, 2014; and all three concentrates field-tested positive for marijuana. Omar claims that the search warrant was stale because it was obtained on July 30, 2014, but not executed until August 7, 2014, for a delay of eight days. Given the totality of the circumstances, however, the search warrant was not stale. *Russo*, 439 Mich at 605.

Law enforcement was seeking to search a suspected marijuana dispensary that was continuing to sell marijuana in violation of the law. The affidavit provided that a credible and reliable informant had purchased marijuana concentrate on three occasions from Hydroworld in July 2014. The crime being investigated, i.e., selling marijuana from a medical marijuana dispensary, was an inherently ongoing scheme that was likely to be continuing. *Id*. at 605-606. Again, the search warrant specified that law enforcement was not only looking for marijuana, but for records pertaining to the sale of marijuana and operation of dispensary. Under these circumstances, there was a fair probability that some or all of those items would still be located at Hydroworld despite the eight-day delay between obtaining and executing the search warrant. *Sobczak-Obetts*, 253 Mich App at 110. Accordingly, the trial court did not err in denying Omar's motion to suppress the evidence seized in the August 7, 2014, search of Hydroworld on the grounds that the search warrant was stale. *Gingrich*, 307 Mich App at 661.

Omar also argues that this particular search warrant was deficient because the prosecution never presented a police report supporting that a controlled buy actually occurred on July 29, 2014, as stated in the supporting affidavit. Assuming, arguendo, that no controlled buy actually occurred on that date, Omar has fallen far short of meeting his "burden of showing, by a preponderance of the evidence, that the affiant knowingly and intentionally, or with a reckless disregard for the truth, inserted false material into the affidavit and that the false material was necessary to the finding of probable cause." *Waclawski*, 286 Mich App at 701. Omar has advanced no allegations, and certainly no factual support, for a finding that Kent County Sheriff's Deputy Todd Butler, the affiant, knowingly and intentionally, or with a reckless disregard for the truth, fabricated that a controlled buy occurred in July 29, 2014. Indeed, Omar has provided no evidence that a controlled buy did not occur on that date. Accordingly, the trial court did not err in denying Omar's motion to suppress the evidence seized in the August 7, 2014 search of Hydroworld on the grounds that the affidavit supporting the search warrant contained material misstatements. *Gingrich*, 307 Mich App at 661.

The trial court also did not err in denying Roberto's motion to suppress the evidence seized during the August 7, 2014 search of 1809 Aberdeen on the grounds that Deputy Butler made material misstatements in the supporting affidavit.

Roberto incorporates by reference Omar's argument regarding the alleged misstatement that a controlled buy occurred on July 29, 2014. As discussed, that allegation does not require reversal. Roberto cites, however, another alleged misstatement particular to the affidavit supporting the search warrant for 1809 Aberdeen. Roberto cites the following allegation:

> Your affiant using the reliable confidential informant purchased marijuana concentrate from Roberto Gonzalez on 7-29-2014 at Hydroworld located at 6701 Old 28th St SE.

> our [sic] affiant purchased marijuana concentrate from Omar Gonzalez on 7-29-2014 from Hydroworld located at 6701 Old 28th St SE.

Roberto argues that, because he and Omar never worked together on the same day at Hydroworld, one of these allegations must be false. Nonetheless, the fact that the second sentence appears in the affidavit is ultimately irrelevant because Roberto has put forth no evidence to satisfy his "burden of showing, by a preponderance of the evidence, that [Deputy Butler] knowingly and intentionally, or with reckless disregard for the truth, inserted false material into the affidavit[.]" *Waclawski*, 286 Mich App at 701. Roberto has not even made an allegation to that effect, below or in this Court. Accordingly, Roberto is not entitled to relief on his claim that the affidavit supporting the search warrant for 1809 Aberdeen was defective because it contained material misstatements. *Id*.

Roberto also argues that the allegations from the confidential informant detailed in the supporting affidavit were insufficiently reliable to support a finding of probable cause.

MCL 780.653 provides:

> The judge or district court magistrate's finding of reasonable or probable cause shall be based upon all the facts related within the affidavit made before him or her. The affidavit may be based upon information supplied to the complainant by a named or unnamed person if the affidavit contains 1 of the following:

> * * *

> (b) If the person is unnamed, affirmative allegations from which the judge or district magistrate may conclude that the person spoke with personal knowledge of the information and either that the unnamed person is credible or that the information is reliable.

"Personal knowledge can be inferred from the stated facts." *People v Martin*, 271 Mich App 280, 302; 721 NW2d 815 (2006). The information in the affidavit was sufficient to allow the magistrate to conclude that the confidential informant spoke with personal knowledge and that the information was reliable. Deputy Butler's affidavit provided the details of the controlled

buys. Deputy Butler would meet with the confidential informant and search him. Deputy Butler would then personally observe the confidential informant enter Hydroworld, and then return marijuana wax to Deputy Butler promptly after leaving. The confidential informant told Deputy Butler that he purchased the marijuana wax from either Roberto or Omar. Deputy Butler averred that, to his knowledge, the confidential informant had never provided any untruthful information. Under these strict controlled-buy circumstances, the information in the affidavit was sufficient to allow the magistrate to conclude that the confidential informant spoke with personal knowledge and that the information was reliable. *Id.*; MCL 780.653(b). Accordingly, the trial court did not err in denying Roberto's motion to suppress the evidence seized from 1809 Aberdeen on the ground that the statements of the confidential informant in the supporting affidavit were unreliable.[1] *Gingrich*, 307 Mich App at 661.

Defendants next argue that the trial court erred in denying their requests for § 4 immunity or, alternatively, the ability to present a § 8 defense to the jury under the Michigan Medical Marihuana Act ("MMMA"), MCL 333.26421 *et seq.*[2] We disagree.

This Court reviews for an abuse of discretion a trial court's ruling on a motion to dismiss under the MMMA. *People v Bylsma*, 493 Mich 17, 26; 825 NW2d 543 (2012). Any underlying questions of regarding the interpretation of the MMMA, however, are reviewed de novo. *Id.*

> [S]pecific factual findings made by the trial court in a § 4 immunity hearing are reviewed under the clearly erroneous standard, and questions of law surrounding the grant or denial of § 4 immunity are reviewed de novo. Further, the trial court's ultimate grant or denial of immunity is fact-dependent and is reviewed for clear error. [*People v Hartwick*, 498 Mich 192, 214-215; 870 NW2d 37 (2015).]

"A ruling is clearly erroneous if the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *Bylsma*, 493 Mich at 26 (citation and quotation marks omitted).

"Section 4 [of the MMMA] provides a broad grant of immunity from criminal prosecution and civil penalties to registered qualifying patients and connected primary caregivers." *Hartwick*, 498 Mich at 215. A defendant bears the burden of proving his entitlement to § 4 immunity by proving each necessary element by a preponderance of the evidence. *Id.* at 217. Omar and Roberto sought to establish § 4 immunity as primary caregivers.

---

[1] To the extent that, in Docket No. 327860, Omar argues that the confidential informant was unreliable, the same analysis and conclusion applies.

[2] The MMMA uses an outdated spelling, "marihuana." Michigan appellate courts generally employ the current and common spelling "marijuana" unless quoting from the MMMA or cases that use the older spelling. See, e.g., *People v Hartwick,* 498 Mich 192, 198 n 2; 870 NW2d 37 (2015).

[A] primary caregiver seeking to assert the protections of § 4 must prove four elements by a preponderance of the evidence. A primary caregiver must prove that, at the time of the charged offense, he or she (1) possessed a valid registry identification card; (2) possessed no more marijuana that allowed under § 4(b); (3) stored any marijuana plants in an enclosed, locked facility; and (4) was assisting connected qualifying patients with the medical use of marijuana. If the primary caregiver establishes the first and second elements, then a presumption exists that the primary caregiver was engaged in the medical use of marijuana, thereby establishing the fourth element. [*Id*. at 221.]

See also MCL 333.26424(a)-(b).

"Section 8(a) of the MMMA provides any patient or primary caregiver—regardless of registration with the state—with the ability to assert an affirmative defense to a marijuana-related offense." *Id*. at 226. "[I]f a defendant establishes these [§ 8] elements and no question of fact exists regarding these elements, then the defendant is entitled to dismissal of the criminal charges." *Id*. at 227. However, "if questions of fact exist, then dismissal of the charges is not appropriate and the defense must be submitted to the jury." *Id*. (quotation marks and citation omitted). "A defendant seeking to assert the MMMA's statutory affirmative defense must present prima facie evidence for each element of § 8(a)." *Id*. at 228. These are elements are:

(1) A physician has stated that, in the physician's professional opinion, after having completed a full assessment of the patient's medical history and current medical condition made in the course of a bona fide physician-patient relationship, the patient is likely to receive therapeutic or palliative benefit from the medical use of marihuana to treat or alleviate the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition;

(2) The patient and the patient's primary caregiver, if any, were collectively in possession of a quantity of marihuana that was not more than was reasonably necessary to ensure the uninterrupted availability of marihuana for the purpose of treating or alleviating the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition; and

(3) The patient and the patient's primary caregiver, if any, were engaged in the acquisition, possession, cultivation, manufacture, use, delivery, transfer, or transportation of marihuana or paraphernalia relating to the use of marihuana to treat or alleviate the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition. [MCL 333.26428(a)(1)-(3).]

In *Hartwick*, 498 Mich at 229, the Supreme Court reduced element § 8(a)(1) to three sub-elements: (1) a bona-fide physician-patient relationship must exist; (2) the physician must complete "a full assessment of the patient's medical history and current medical condition" and; (3) as a result, the physician must be of the "professional opinion that the patient has a

debilitating medical condition and will likely benefit from the medical use of marijuana to treat the debilitating medical condition." The first sub-element requires "proof of an actual and ongoing physician-patient relationship at the time the written certification was issued." *Id*. at 231. The second sub-element requires "medical records or other evidence [demonstrating] that the physician actually completed a full assessment of the patient's medical history and current medical condition before concluding that the patient is likely to benefit from the medical use of marijuana and before the patient engages in the medical use of marijuana." *Id*. at 230-231. The third sub-element requires, at minimum, a valid registry identification card. *Id*. at 230. "A primary caregiver has the burden of establishing the elements of § 8(a)(1) for each patient to whom the primary caregiver is alleged to have unlawfully provided marijuana." *Id*. at 232.

As to the second element of § 8(a), "[p]rimary caregivers must establish the amount of usable marijuana needed to treat their patients' debilitating medical conditions and then how many marijuana plants the primary caregiver needs to grow in order [to] ensure 'uninterrupted availability' for the caregiver's patients." *Id*. at 235. This can be established through "testimony regarding how much usable marijuana each patient required and how many marijuana plants and how much usable marijuana the primary caregiver needed in order to ensure each patient the 'uninterrupted availability' of marijuana." *Id*.

The third element of § 8(a) requires that patients "present prima facie evidence regarding their use of marijuana for a medical purpose regardless whether they possess a registry identification card" and that primary caregivers "present prima facie evidence of their own use of marijuana for a medical purpose and any patients' use of marijuana for a medical purpose." *Id*. at 237. "A registry identification card merely qualifies a patient for the medical use of marijuana. It does not establish that at the time of the charged offense, the defendant was actually engaged in the protected use of marijuana." *Id*.

Defendants' contention that there are "factual disputes" that require the submission to a jury of their claims of entitlement to immunity under § 4 are without merit. Whether a defendant is entitled to immunity under § 4 is a question of law for the trial court to decide. *Id*. at 217, 239, 243. Moreover, defendants appear to suggest that the prosecution was required to prove that defendants' actions violated the MMMA. This is simply untrue. A defendant bears the burden of establishing his entitlement to § 4 immunity or a § 8 defense. *Id*. at 215, 228.

The trial court properly ruled that Omar was not entitled to § 4 immunity for the charges arising from the October 30, 2013 search at Hydroworld because he possessed far more marijuana that was allowed under the statute. Omar produced valid registry identification cards establishing that he was a registered patient and caregiver, the first necessary element. *Id*. at 221. At the MMMA hearing, the prosecution conceded that Omar was caregiver to five validly registered patients at all times. Omar does not allege that he ever had more than five patients at any time. "When a primary caregiver is connected with one or more qualifying patients, the amount of usable marijuana and the number of plants is calculated in the aggregate—2.5 ounces of usable marijuana and 12 marijuana plants for each qualifying patient, including the caregiver if he or she is also a registered qualifying patient acting as his or her own caregiver." *Id*. at 218-219. Thus, because he was caregiver to five patients and himself, Omar was allowed to possess up to 15 ounces (2.5 ounces x 6) and 72 plants (12 plants x 6) of marijuana. *Id*. 15 ounces equates to 0.9375 pounds (16 ounces/15 ounces), and Detective Alderink testified that almost 2.5

pounds of "finished" marijuana was seized from Hydroworld on October 30, 2013. Thus, Omar was in possession of approximately 2.5 times the amount of marijuana he was allowed to possess under the MMMA. Before the trial court, Omar vaguely asserted that the police "grossly overstated" the weight of the seized marijuana. However, Omar presented no evidence to support that assertion, and he bore the burden of establishing each element of § 4 immunity by a preponderance of the evidence. *Id.* at 217. In light of Detective Alderink's testimony that approximately 2.5 pounds of finished marijuana was seized and the dearth of evidence supporting Omar's claim that the police overstated that weight, we are not left with a definite and firm conviction that the trial court made a mistake in finding that Omar possessed more marijuana than he was allowed. *Bylsma*, 493 Mich at 26. The Supreme Court has held that "[a] qualifying patient or primary caregiver in possession of more marijuana than allowed under § 4(a) and § 4(b) at the time of the charged offense cannot satisfy the second element of immunity[,]" and, therefore, the trial court did not err in ruling that Omar was not entitled to § 4 immunity on the marijuana-related charges arising from the October 30, 2013 search of Hydroworld. *Hartwick*, 498 Mich at 219. Moreover, Omar presented no evidence to establish the third element, i.e., that the marijuana was kept in an enclosed, locked facility compliant with the MMMA. *Id.* at 221. Thus, the trial court did not abuse its discretion in denying Omar's motion to dismiss those charges under § 4 of the MMMA. *Bylsma*, 493 Mich at 26.

Regarding the search of Hydroworld on August 7, 2014, the trial court did not err in ruling that Omar was not entitled to immunity under § 4. Omar presented a valid registry identification and documentation that he was a registered caregiver to five patients, establishing the first element. *Hartwick*, 498 Mich at 221. However, he presented absolutely no evidence to support that he possessed no more marijuana than allowed under the MMMA. His affidavit and testimony at the hearing contained no allegations as to whether Omar possessed a compliant amount of marijuana. Moreover, Omar also made no claim that the marijuana was kept in an enclosed, locked facility. Thus, he cannot establish the second and third necessary elements of § 4 immunity. *Id.* Accordingly, the trial court properly denied his motion for immunity from the charges arising from the August 7, 2014 search of Hydroworld under § 4. *Bylsma*, 493 Mich at 26.

The trial court also did not err in denying Omar's motion to dismiss the charges under § 8 or, alternatively, present that defense to a jury.

In both Docket Nos. 327859 and 327860, Omar failed to present prima facie evidence of at least two of the elements of § 8(a)(1). Omar presented absolutely no evidence to support the first element with regard to himself or any of his patients, i.e., "proof of an actual and ongoing physician-patient relationship at the time the written certification was issued." *Hartwick*, 498 Mich at 231. Omar presented no evidence or testimony describing the physician-patient relationships of any of his patients or even himself. At most, Omar averred that Hydroworld "facilitated the application and physician certification process by having regular hours and having a physician present on the premises to physically examine patients, make his determination, and complete the paperwork processing." There are no details as to who this physician was or whether he actually examined or certified Omar or any of his patients. At most, it demonstrates that a physician wrote certifications after examining potential patients on a single occasion, which certainly does not constitute an "ongoing" physician-patient relationship. Omar also failed to present any evidence of the second sub-element, i.e., that the physician made a full

assessment of the patient's medical history and current medical conditions. Omar testified at the hearing that *he* discussed with potential patients their medical problems, but Omar is not a physician. The statement in his affidavit that a physician was on the premises to "physically examine" potential patients is nonspecific to any actual patients and does not establish that the physician conducted the necessary review of a potential patient's medical records and current status. Although the prosecution did stipulate the Omar had a five validly registered patients at all relevant times, thus providing minimal evidence necessary for sub-element three, because he failed to present any evidence of the first two elements, § 8(a)(1) was not satisfied.

Omar also presented no evidence to support that he possessed the amount of usable marijuana and marijuana plants necessary to ensure uninterrupted availability to his patients. Omar did not testify regarding the particular needs of any of his patients or himself. Omar was aware that, under § 4, he could possess 2.5 ounces of usable marijuana per patient, but "nothing in the MMMA supports the notion that the quantity limits found in the immunity provision of § 4 should be judicially imposed on the affirmative defense provision of § 8." *Id*. at 234. Omar simply failed to present any evidence regarding the amount of marijuana reasonably necessary to meet the treatment needs of his patients and, therefore, failed to satisfy § 8(a)(2).

Omar also did not present prima facie evidence as required by § 8(a)(3). The record is completely devoid of any evidence regarding his patients' use of marijuana at all, much less whether it was for a medical purpose. Although Omar's patients possessed valid registry identification cards, those cards are insufficient to "establish that at the time of the charged offense[s], the defendant was actually engaged in the protected use of marijuana." *Id*. at 237. Accordingly, Omar failed to present prima facie evidence under § 8(a)(3).

Because Omar failed to present prima facie evidence of any of the three necessary elements of a § 8 defense with regard to the charges arising from the October 30, 2013 search of Hydroworld, or the subsequent search on August 7, 2014, the trial court properly denied his motion to dismiss the charges on this basis or, alternatively, present his § 8 defense to a jury. *Bylsma*, 493 Mich at 26.

In Docket No. 327861, the trial court did not err in ruling that Roberto was not entitled to immunity under § 4. Roberto presented a valid registry identification and documentation that he was a registered caregiver to at least three patients, establishing the first element. *Id*. at 221. However, Roberto presented absolutely no evidence to support that he possessed no more marijuana than allowed under the MMMA. Roberto did not testify at the hearing, and his affidavit only contains the statement that he "was permitted to possess plants as allowed by MCL 333.26424(a)." While this assertion is true, Roberto makes no attempt to prove that the amount of usable marijuana he possessed was within the limits of the MMMA. Roberto also made no claim that the marijuana was kept in an enclosed, locked facility. Thus, Roberto cannot establish the second and third necessary elements of § 4 immunity. *Id*. Accordingly, the trial court properly denied his motion for immunity from the instant charges under § 4.

The trial court also did not err in denying Roberto's motion to dismiss the charges in Docket No. 327861 under § 8 or, alternatively, present that defense to a jury. Roberto failed to present prima facie evidence of element § 8(a)(1). Roberto presented absolutely no evidence to support the first element with regard to himself or any of his patients, i.e., "proof of an actual and

-11-

ongoing physician-patient relationship at the time the written certification was issued." *Id*. at 231. Roberto presented no evidence or testimony describing the physician-patient relationships of any of his patients or even himself. Roberto's affidavit makes no mention of physician certifications or whether he or any of his patients had any kind of physician-patient relationship. Roberto also failed to present any evidence of the second sub-element, i.e., that a physician made a full assessment of the patient's medical history and current medical conditions. Although the prosecution did stipulate that Roberto had validly registered patients at all relevant times, thus providing minimal evidence necessary for sub-element three, because he failed to present any evidence of the first two elements, § 8(a)(1) was not satisfied.

Roberto also presented no evidence to support that he possessed the amount of usable marijuana and marijuana plants necessary to ensure uninterrupted availability to his patients. Roberto did not testify regarding the particular needs of any of his patients or himself. He simply failed to present any evidence regarding the amount of marijuana reasonably necessary to meet the treatment needs of his patient and, therefore, failed to satisfy § 8(a)(2).

Roberto also did not present prima facie evidence as required by § 8(a)(3). The record is completely devoid of any evidence regarding his patients' use of marijuana at all, much less whether it was for a medical purpose. Although Roberto's patients possessed valid registry identification cards, those cards are insufficient to "establish that at the time of the charged offense[s], the defendant was actually engaged in the protected use of marijuana." *Id*. at 237. Accordingly, Roberto failed to present prima facie evidence under § 8(a)(3).

Because Roberto failed to present prima facie evidence of any of the three necessary elements of a § 8 defense with regard to his charges arising from the August 7, 2014 search, the trial court properly denied his motion to dismiss the charges on this basis or, alternatively, present his § 8 defense to a jury. *Bylsma*, 493 Mich at 26.

Lastly, in Docket No. 327859, Omar argues that the trial court erred in denying his motion to quash his bindover. In Docket No. 327861, Roberto also argues that the trial court erred in denying his motion to quash his bindover. We disagree on both counts.

"We review for an abuse of discretion a district court's decision to bind over a defendant." *People v Hudson*, 241 Mich App 268, 276; 615 NW2d 784 (2000).

> A circuit court's decision with respect to a motion to quash a bindover is not entitled to deference because this Court applies the same standard of review to this issue as the circuit court. This Court therefore essentially sits in the same position as the circuit court when determining whether the district court abused its discretion. [*Id*.]

"A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *People v Waterstone*, 296 Mich App 121, 131-132; 818 NW2d 432 (2012).

However, if a defendant proceeds to trial and is found guilty, any subsequent appeal does not consider whether the evidence adduced at the preliminary examination was sufficient to

warrant a bindover. *People v Yost*, 468 Mich 122, 124 n 2; 659 NW2d 604 (2003). An evidentiary deficiency at defendant's preliminary examination is no basis for vacating or reversing a subsequent conviction where the defendant received a fair trial and was not otherwise prejudiced by the error and no appeal exists to review the allegation of such evidentiary error. *People v Hall*, 435 Mich 599, 601-603, 460 NW2d 520 (1990); *People v Wilson*, 469 Mich 1018; 677 NW2d 29 (2004). In these cases, defendants proceeded to trial and were found guilty. They make no allegations of an unfair trial or prejudice resulting from the alleged error at the preliminary examinations. Thus, no appeal lies from the claims of evidentiary errors at their preliminary examinations.

Affirmed.


/s/ Douglas B. Shapiro
/s/ Joel P. Hoekstra
/s/ Deborah A. Servitto